### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 05-66-P-S** |
| | ) | |
| **EVANS ETRONS STROMAN,** | ) | |
| | ) | |
| **Defendant** | ) | |

### MEMORANDUM DECISION ON MOTION TO STRIKE AND
### RECOMMENDED DECISION ON MOTION TO SUPPRESS

Evans Etrons Stroman, charged with being a felon in possession of a firearm (a Stallard Arms model JS, 9 millimeter-caliber pistol bearing serial number 065563) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), seeks to suppress statements and other evidence purportedly obtained in contravention of his Fourth, Fifth, Sixth and Fourteenth Amendment rights and in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).[1]  *See* Indictment (Docket No. 21); Motion To Suppress Evidence ("Motion To Suppress") (Docket No. 29).  An evidentiary hearing was held before me on December 15, 2005 at which the defendant appeared with counsel.  Immediately after the close of evidence I heard oral argument.  Post-hearing, the government submitted what it styled a "notice" regarding Maine's concealed-weapon statute, *see* Government's Notice Regarding Maine's Concealed Weapon Statute ("Post-Hearing Notice") (Docket No. 39), which the defendant moved to strike, *see*

---

[1] Per *Miranda*, an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney *(continued on next page)*

1

Defendant's Motion To Strike Government's Notice Regarding Maine's Concealed Weapons Statute ("Motion To Strike") (Docket No. 44).  For the reasons discussed below, I deny the Motion To Strike. With the benefit of the parties' motion papers and oral argument, and based on the evidence adduced at the hearing, I recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

## I.  Proposed Findings of Fact

At about 5:10 a.m. on July 15, 2003 Lieutenant Donald Mailhot and Sergeant Mark Cornelio of the Lewiston Police Department ("LPD") heard a radio broadcast from LPD dispatch as Mailhot was entering Cornelio's cruiser at police headquarters in Lewiston, Maine.  The dispatcher stated that a female caller had reported that two black males in t-shirts, one of whom was named "B.J.," were attempting to kick in the outside door of an apartment building at 287 Bates Street ("287 Bates") in Lewiston.  LPD officers knew the neighborhood in which 287 Bates was located to be a low-income, high-crime, high-drug-trafficking area.  Cornelio and other officers (but not Mailhot) also were personally familiar with a black male named B.J. Almeida, with whom they had previous law-enforcement encounters primarily concerning drug violations.  Although Mailhot and Cornelio heard other officers indicate that they were responding to the call, they were only a block away and thus immediately drove there themselves.

Upon arriving at 287 Bates at about 5:13 a.m. Mailhot and Cornelio saw one black male standing on its front porch.  Cornelio observed (and told Mailhot) that the man on the porch was not B.J. Almeida, whom Cornelio knew to be a heavyset man.[2]  Mailhot and Cornelio questioned the man,

---

one will be appointed for him prior to any questioning if he so desires."  *Miranda*, 384 U.S. at 478-79.

[2] LPD Officer David M. Levesque, who also was personally familiar with B.J. Almeida, testified that he was a chubby black male about five feet six inches tall who usually wore his hair in cornrows.  Levesque could not recall whether, on the morning of July 15, *(continued on next page)*

who later was identified as B.J. Almeida's brother Jose Almeida, about his identity, but the man was uncooperative, denying that he had any identification documents and declining to provide any information other than to say that he was from Massachusetts.  At about 5:23 a.m. Cornelio radioed dispatch to check whether there were any outstanding warrants for B.J. Almeida's arrest.  He and Mailhot learned that there was an outstanding warrant for carrying a concealed weapon.

By this time other officers had arrived.  Mailhot got into Cornelio's cruiser to see if he could find either B.J. Almeida or a vehicle nearby with Massachusetts license plates, which might provide a clue to the identity of the man on the porch.  At that time it still was not clear to Mailhot what was going on; for all he knew, a burglary or home invasion might be in process.  He drove down Bates Street, turned right on Maple Street, turned right on Knox Street and pulled into a parking lot at 66 Knox Street, behind 315 Bates Street ("315 Bates").  There he spotted a blue Subaru Legacy with Massachusetts license plates parked not in a parking slip but rather in an unusual position alongside the back stairwell of 315 Bates – a location approximately three hundred feet (or three telephone poles) from 287 Bates.  He saw two people in the backseat – as far as he could tell, a male and a female.

Mailhot stopped the cruiser about twenty-five feet behind the car and, at about 5:35 a.m., radioed its license-plate number into dispatch.  He then alighted from his vehicle, turned on his portable radio and cautiously began to approach the car.  Approximately seventeen or eighteen seconds prior to the time he called in the license-plate number, Cornelio and another officer (Patrick Griffin) radioed that they had located B.J. Almeida.[3]  Although Cornelio's cruiser was equipped with

---

2003, dispatch provided a description of B.J. Almeida.

[3] After Mailhot left, Cornelio began to search 287 Bates for B.J. Almeida while other officers searched for him outside the building and one officer remained on the porch with Jose Almeida.  Cornelio found B.J. Almeida hiding in an enclosed fire-egress hallway in the *(continued on next page)*

a police radio and Mailhot was wearing a working portable radio, his attention was focused on the individuals he had spotted, and he did not hear the announcement.[4] He therefore did not realize that B.J. Almeida had been apprehended.  Even had he heard the announcement, he still would have proceeded to attempt to identify the vehicle's occupants.  He could not have been certain that the original two suspects had acted alone.

As he approached the vehicle a black male (later identified as the defendant) exited the car with his hands in his pockets and began walking away from Mailhot toward the stairway of 315 Bates. He was wearing a bandana and ball cap on his head and a heavy, insulated leather coat inappropriate for the season.  Mailhot, who had twenty-four years' experience with the LPD, knew that such jackets sometimes were worn in summer for the purpose of concealing weapons.  All of these factors – including the high-crime nature of the neighborhood, the reported threat to break down the door at 287 Bates, the uncooperativeness of the suspect on the porch, what Mailhot then (erroneously) believed to be the unknown whereabouts of B.J. Almeida, the Massachusetts license plate, the odd parking position of the car, the presence of the man and woman awake in the backseat of the car at that hour of the morning in the vicinity of the site of the reported disturbance, the defendant's attire and the fact that he had his hands in his pockets and was walking away – caused Mailhot to be very concerned for his safety as well as that of his fellow officers still investigating the report at 287 Bates.  By then, as he

_____

basement of the building.  He radioed for backup, and Griffin promptly joined him.  After reconfirming the existence of the warrant, Cornelio arrested B.J. Almeida.  On cross-examination of Cornelio, defense counsel established that it was possible Cornelio might have found B.J. Almeida as early as 5:23 a.m., when he first radioed dispatch regarding the outstanding warrant.  *See* Gov't Exh. 9.  However, the following persuade me that Cornelio discovered B.J. Almeida at approximately 5:35 a.m.: (i) Mailhot's explanation that Cornelio radioed dispatch to check on the status of B.J. Almeida's warrant while both men were standing on the porch of 287 Bates, (ii) Cornelio's testimony that he probably found B.J. Almeida closer to 5:35 a.m., and (iii) dispatch notations that, as explicated by officers' testimony, indicate that Cornelio was "rear with BJ," or at the rear of 287 Bates with B.J. Almeida, at 5:35:37 a.m. and Griffin was "rear with BJ" at 5:35:38 a.m.

[4] After Mailhot alighted from the cruiser, he turned on his portable radio.  If, as is possible, the broadcast of B.J. Almeida's apprehension was made during that interval, he could have missed it for that reason.

4

described it: "I was very, what we would consider on red alert.  You know, bells and whistles were going off."

Mailhot called to the defendant to stop and not to move.  He intended to identify him to see whether he was B.J. Almeida and pat him down for the presence of weapons.  The defendant turned partway toward him, hands still in his pockets, protesting that Mailhot was picking on him because he was black and that he was doing nothing wrong.  Mailhot then approached him, forcibly took his hands out of his pockets and placed them on top of his head, intending to grab his fingers with one hand and pat him down with the other.  However, before Mailhot could do so, the defendant broke away, peeling out of his leather jacket, and ran toward 66 Knox Street, where he made a right turn toward Birch Street and disappeared from Mailhot's view.  Mailhot, who was left holding the jacket and the ballcap, was unable to give chase given his age and physical condition.  At about 5:38 a.m. he radioed to fellow officers that a tall black male was running away from him.

Levesque, who had responded to the reported disturbance at 287 Bates and had been searching on foot for B.J. Almeida, heard Mailhot's broadcast and then saw a black male running on Knox Street.  Levesque knew that the fleeing man, who was more than six feet tall and thin, was not B.J. Almeida, whom he knew to be short and stocky.  He began to give chase.  At approximately the same time LPD Officer Joel Gagne, who was driving nearby in his cruiser, also responded to Mailhot's call.  As he turned the corner onto Knox Street he observed a male running westbound in the middle of the street.  He exited his cruiser and began chasing the male, calling out "alone" as he did so.  He spotted Levesque, and the two together pursued the suspect.  The man ducked in between some buildings, and the officers temporarily lost sight of him; however, they suspected he might have fled into a four-floor apartment building at 54 Knox Street ("54 Knox").  Fearful for their safety, they

ascended the narrow stairwell of the apartment building with guns drawn.[5]

Levesque, with Gagne following close behind him, found the defendant lying face-down on top of a sweatshirt on the fourth-floor hallway in an apparent attempt to hide. The officers loudly commanded the defendant not to move. Levesque kept his gun trained on the defendant while Gagne holstered his weapon and immediately handcuffed him. Gagne then patted the defendant down and found in his right front pocket a sheathed four-inch-long throwing knife. He placed the defendant under arrest for unlawful trafficking in dangerous knives. He also seized the sweatshirt but did not then examine it. In the circumstances his goal was to remove the defendant from the building as quickly as possible: The lighting was low, quarters were tight on the stairwell, the defendant for reasons unknown to Gagne had been fleeing Mailhot, and Gagne had just found what he considered to be a dangerous weapon concealed on the defendant's person. He and Levesque escorted the defendant from the building, and he placed the defendant in his cruiser and drove him to the parking lot behind 315 Bates, where Mailhot, the commanding officer in charge of the investigation, had remained.

In the interval during which Levesque and Gagne were chasing and arresting the defendant, Mailhot had directed the female occupant of the car to step out and had patted her down to search for weapons. He found no weapons on her person, but during that interaction noticed a large sword and a folding knife on the passenger rear floor. He retrieved these items and secured them in Cornelio's cruiser. He identified the female as Kellie Rust of Weymouth, Massachusetts. Jose Almeida, who had been released after eventually identifying himself to officers, approached Mailhot and asked him for the leather jacket that the defendant had been wearing. Mailhot asked him if the jacket was his, and he

---

[5] Gagne had heard the initial radio broadcast naming "B.J." as a person involved in the disturbance. He considered B.J. Almeida a very dangerous person, having had prior dealings with him concerning crimes against persons and having been told by him that he (B.J. Almeida) had stabbed someone while in prison. Given the possible connection between the fleeing suspect and B.J. Almeida, the *(continued on next page)*

6

denied that it was.  Mailhot refused to give it to him.  After Gagne drove the handcuffed defendant to the scene, one of the officers placed the leather jacket on the back of Gagne's cruiser.  Jose Almeida persisted in his effort to retrieve the jacket, signaling to the defendant and approaching Gagne's cruiser even after Gagne warned him to step back.  Gagne then directed LPD Officer Christopher T. Murphy to place Jose Almeida under arrest for obstructing government administration.  While at the scene, Gagne asked the defendant his name, and the defendant responded that he was Evans Stroman.  Because of the distraction caused by Jose Almeida, Gagne deferred further investigation of the defendant.

Gagne transported the defendant, and Murphy separately transported Jose Almeida, to the Androscoggin County Jail (the "Jail") for booking.  While in the booking area of the Jail sometime between 6:06 and 6:39 a.m., Murphy overheard Jose Almeida say something to the defendant in street lingo to the effect of, "Yo, dog, these 'po' could have got ten whack," or "ten bang."  Murphy gathered that Jose Almeida was referring to the police as having been lucky, but otherwise had no idea what he was talking about.  He mentioned the comment to Gagne.

At the Jail Gagne completed his search of the defendant and items found with him, including the sweatshirt, from which he retrieved a plastic baggie containing ten smaller baggies of what he suspected was crack cocaine, as well as $170, a cell phone and a pager.  Based on his training and experience, he considered these items consistent with drug trafficking.  He also found two forms of identification on the defendant's person, one for an Evans Stroman and the other for a different individual.  Because Gagne intended to add a drug-trafficking charge against the defendant, he wanted to be certain he correctly identified him.  He asked what he described as several typical identifying

_____

dangerousness of the neighborhood, the tight corners in the stairway of 54 Knox, and Gagne's lack of knowledge of what was
*(continued on next page)*

questions, the answers to which he double-checked with appropriate agencies and departments, including: Have you ever been arrested before?  Where have you been arrested?  The defendant, who was born on October 19, 1983, *see* Gov't Exh. 12, and was then 19 years old, responded that he had served a year at the "Dartmouth" facility.  Gagne contacted the New Bedford, Massachusetts Police Department, which, in addition to confirming the defendant's identity, advised that he was known to carry a .25-caliber handgun.  Gagne radioed that information to officers still on the scene at 287 Bates, among them Levesque.

After hearing Gagne's report, Levesque returned to the fourth-floor stairwell at 54 Knox.  He looked up and saw a blue bandana sticking out of a ceiling tile directly above the spot where the defendant had been found.  He climbed onto the railing, pushed aside the tile and retrieved a black nine-millimeter handgun wrapped in a blue bandana.  Levesque brought the gun back to the police station and unloaded it, discovering that there was a hollow-point round in the chamber and a solid-point, or full-metal-jacket, round in the clip.  Hollow-point bullets mushroom out on impact and, thus, are more lethal.  Upon learning that Levesque had retrieved a gun at 54 Knox, Murphy concluded that Jose Almeida's street-lingo comment to the defendant had referred to the gun.

Police never pressed charges relating to the reported attempt to break down the front door at 287 Bates.  On August 5, 2003 the defendant was indicted on one count of unlawful trafficking in scheduled drugs in violation of 17-A M.R.S.A. § 1103(1-A)(A) and one count of trafficking in dangerous knives in violation of 17-A M.R.S.A. § 1055(1).  *See* Gov't Exh. 12.  Effective August 8, 2003 attorney George Hess was appointed to represent the defendant, who pleaded not guilty at his arraignment.  *See* Gov't Exh. 15 at 1-2.  On November 5, 2003 the State filed an information adding a

---

transpiring other than that someone was fleeing a fellow officer, he was quite concerned for his safety.

third count against the defendant – unlawful furnishing of scheduled drugs in violation of 17-A M.R.S.A. § 1106(1-A)(A). *See* Gov't Exh. 13. That day, the defendant pleaded guilty to the third count only. *See* Gov't Exh. 14. The court accepted his plea and sentenced him on that count to two years' imprisonment with all but six months suspended, to be followed by two years' probation. *See id.;* Gov't Exh. 15 at 3-4. The same day, the State dismissed the remaining two charges. *See* Gov't Exh. 15 at 4. At no time, in connection with the state charges, did the defendant admit to having possessed a gun.[6]

Shortly after the defendant was arrested on state charges, on or about July 21, 2003, the LPD referred his case to Trevor Campbell, an LPD officer who serves as a special agent of the Central Maine Violent Crimes Task Force ("Task Force"). The Task Force investigates such matters as possession by felons of firearms, stolen-firearms complaints and cases involving armed career criminals. Campbell took custody of the firearm that had been retrieved from 54 Knox and sent it to the Maine State Police ("MSP") crime laboratory for fingerprint analysis. He also ran criminal-history and firearms checks on the defendant. On December 3, 2003 Campbell received results of the fingerprint analysis. Campbell was aware that the defendant had been convicted of state drug charges and was serving his sentence at the Jail. On December 19, 2003 he and Deputy United States Marshal Christopher Clifford, then a newly appointed coordinator for the Task Force, traveled to the Jail to interview the defendant regarding the firearm. Campbell did not seek to interview the defendant prior to that time because he had been awaiting the results of the fingerprint analysis.

Jailors brought the defendant to the photo room, an eight-by-ten-foot room within the booking

---

[6] In his motion papers, the defendant asserted that following the discovery of the gun he was arrested, *inter alia*, on a charge of possession of a handgun by a prohibited person in violation of 17 M.R.S.A. § 393. *See* Motion at 3. He contended that the State did not file that charge against him because of insufficient evidence: The gun had been discovered after his arrest, and he denied having *(continued on next page)*

9

area of the Jail.  The outer door was left slightly ajar.  There, Campbell read him his *Miranda* rights

from a Task Force form, indicating after each that the defendant had responded "Yeah" or "Yes" when

asked if he understood that right.  *See* Gov't Exh. 10.  Campbell also indicated that the defendant

responded "Yes" when asked if, having those rights in mind, he wished to answer questions at that

time.  *See id*.  The defendant and Campbell both signed the form.  *See id*.  Campbell told the defendant

that he had obtained results of a fingerprint analysis.  He inquired whether the defendant had any

reason to believe his fingerprints would be on the gun, adding that this was an opportunity for him to

preserve some integrity by telling the truth.  In fact, the defendant's fingerprints had not been found on

the gun.  However, Campbell, who would have had no case without the defendant's confession,

insinuated that they had been, consistent with interrogation techniques he had been taught.  The

defendant, who appeared nervous and was avoiding eye contact with Campbell, denied that he had any

involvement with the gun or had any reason to believe his fingerprints would be found on it.  He did

not ask for a lawyer at any point during the interview, which lasted a total of about ten minutes.[7]  At its

conclusion, Campbell gave the defendant a business card and encouraged him to call if he decided he

wanted to tell the truth.[8]  Campbell recalled that the defendant had mentioned that he was due to be

---

possessed it.  *See id*. at 4.  At hearing, the defendant adduced no documentary evidence of these facts; however, on cross-examination one of the government's witnesses, Trevor Campbell, essentially corroborated this story.

[7] Clifford testified that he did not remember whether, on December 19, 2003, the defendant concluded the interview by asking for a lawyer, saying he already had a lawyer or advising that he did not want to talk to Campbell and Clifford.  However, both Campbell and the defendant testified, and I find, that the defendant did not request a lawyer that day.

[8] At hearing, the defendant in some respects painted a different picture of what transpired on December 19, 2003, testifying that Campbell (i) flatly told him his fingerprint had been found on the gun, (ii) promised him he would be released and would not be charged with any crime if he cooperated, and (iii) advised him that if he did not cooperate, he would continue to be held after his scheduled release date of December 29 and was "going to be looking at some serious time."  The defendant testified that it was very important to him to be released as scheduled so that he could be present at the birth of his child, and accordingly he contacted Campbell three days later to make a statement.  The defendant acknowledged that on December 19 Campbell read him his *Miranda* rights; however, he claimed that he did not understand them.  I do not find the defendant's version of events to be wholly credible.  Prior to his July 15, 2003 encounter with the LPD, the defendant had twice been jailed for crimes.  He had been read his *Miranda* rights and had been represented by counsel in both instances.  He has an eighth grade education and can read and write.  He was represented by counsel during prosecution of the state charges stemming from the July 15, 2003 encounter with police.  At no time, in connection with that

*(continued on next page)*

10

released soon (on December 29, 2003); however, Campbell denied that this fact had any particular significance for him with respect to his federal investigation.[9]

On December 22, 2003 Campbell received a phone call from a Jail corrections officer who informed him that the defendant wished to speak with him. The same day, Campbell and Clifford returned to the Jail, where they again met with the defendant in the photo room with the outer door slightly ajar. Campbell reminded the defendant that he was still "under" his *Miranda* rights – that is, that they remained operative.[10] The defendant said that he wanted to come clean, explaining that he was worried that he would not be released on his scheduled release date if he did not tell the truth. He admitted that he did possess the gun on the morning of July 15, 2003 and that he had hidden it at 54 Knox. Campbell asked if the defendant would provide a written statement, and he agreed to do so. He provided the statement in his own handwriting and signed it, with Campbell serving as a witness. *See* Gov't Exh. 11. At no point did the defendant request to see a lawyer.

The defendant was released from Jail on his scheduled release date. Campbell did not seek a detainer. Campbell requested an Interstate Nexus Statement ("Nexus Report"), which was completed on February 5, 2004. *See* Criminal Complaint and Affidavit ("Complaint") (Docket No. 5) ¶ 9. That

---

prosecution, did he make any confession regarding possession of the gun. In the circumstances, his testimony that on December 19, 2003 he did not understand his *Miranda* rights rings hollow. His testimony that Campbell promised he would be released as scheduled if he cooperated, and threatened to detain him if he did not, likewise is not credible. On cross-examination, counsel for the government elicited contradictory testimony from the defendant that illustrates a willingness to tailor his testimony to suit his needs at the moment. The defendant initially testified on cross-examination that he made up (or fabricated) his December 22, 2003 confession. Upon being read portions of his written confession by counsel for the government, he stated that some aspects were true; however, he continued to maintain that portions regarding his or Jose Almeida's possession of a gun were false.

[9] Campbell denied that during the December 19 interview he knew the defendant had a newborn baby or told the defendant that he might not be leaving jail. He did not recall telling the defendant that he was going to charge him with a crime.

[10] At hearing, defense counsel established that Campbell typically includes all details he believes important or essential in his police reports and affidavits supporting criminal complaints but that he omitted any mention of the *Miranda* reminder from his police report and affidavit supporting the criminal complaint filed in this matter. *See* Gov't Exh. 16. Nonetheless, inasmuch as (i) Campbell stated on cross-examination that he had an independent memory of having advised the defendant on December 22, 2003 that he still was *Mirandized* and (ii) Clifford, who was sequestered during Campbell's testimony, testified that Campbell did in fact give such a reminder, I credit their testimony that such a reminder was given.

report, by Bureau of Alcohol, Tobacco and Firearms Special Agent Brent McSweyn, determined that the pistol retrieved at 54 Knox was not manufactured in the State of Maine and therefore had traveled in interstate commerce. *See id.* After receiving the Nexus Report, Campbell forwarded the case to the United States Attorney's Office for a decision whether to prosecute. On June 10, 2004 the government filed its complaint initiating the instant case, charging the defendant with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). *See* Complaint at 2. The predicate felony offense on which the government relied was the defendant's 2002 conviction in the State of Massachusetts for possession of a firearm without a license in violation of Mass. Gen. Laws ch. 269, § 10(a). *See id.*.

## II.  Discussion

### A.  Threshold Issues

Before proceeding to the merits of the Motion To Suppress, I pause to consider both the defendant's Motion To Strike and two threshold issues raised by the government: that the defendant (i) fails to demonstrate entitlement to an evidentiary hearing on the Motion To Suppress and (ii) lacks standing to seek suppression of the firearm retrieved by Levesque from the ceiling of 54 Knox. *See* Government's Memorandum of Law in Opposition to Defendant's Pretrial Motion ("Opposition") (Docket No. 34) at 8-14.

### 1.  Motion To Strike

The government's Post-Hearing Notice consisted of the following two sentences: "At the hearing on defendant's motion to suppress, the Government argued that the defendant's possession of the knife (GX 19) violated Maine's concealed weapon statute. That statute is found at 25 MRSA § 2001 (1988)." Post-Hearing Notice. The defendant moved to strike this document and preclude the

court's consideration of the underlying statute on grounds that (i) the filing of the Post-Hearing Notice violated the court's declination to take post-hearing briefs, (ii) the government waived its argument that the statute applied by failing to articulate it either in its Opposition brief or during oral argument, (iii) the statute is in any event inapplicable as a matter of law because the knife in question was a standard hunting knife, and (iv) officers did not rely on the statute as a basis to arrest the defendant. *See generally* Motion To Strike; Defendant's Response to Government's Memorandum of Law in Opposition to Defendant's Motion To Strike Government's Notice Regarding Maine's Concealed Weapon Statute and in Response to Defendant's Supplemental Memorandum ("Strike Reply") (Docket No. 51). The defendant moved, in the alternative, for reopening of the hearing for the purpose of taking testimony from a private investigator and/or expert witness, and additional oral argument, on the asserted inapplicability of the concealed-weapons statute (25 M.R.S.A. § 2001) to the knife found on his person. *See* Motion To Strike at 3; Supplemental Memorandum in Support of Defendant's Motion To Strike Government's Notice Regarding Maine's Concealed Weapons Statute (Docket No. 45).

I decline either to strike the Post-Hearing Notice, ignore the concealed-weapons statute or reopen the hearing. As the government points out, the Post-Hearing Notice is not a brief containing legal argument but simply a notice of a statutory citation – the type of information of which the court, in any event, must take judicial notice. *See* Government's Memorandum of Law in Opposition to Defendant's Motion To Strike Government's Notice Regarding Maine's Concealed Weapon Statute and in Response to Defendant's Supplemental Memorandum ("Strike Opposition") (Docket No. 48) at 6-7; *see also, e.g., White v. Gittens*, 121 F.3d 803, 805 n.1 (1st Cir. 1997) ("The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.") (citation and internal quotation marks omitted).

13

Beyond this, and more importantly, the government did indeed argue at hearing that officers had probable cause to arrest the defendant for carrying a concealed weapon.  *See* Strike Opposition at 4-7; *see also* Transcript of Proceedings (Docket No. 46) at 10-12, 16-17.  The defendant did not then object to that line of argument, join issue with it or seek to reopen the hearing in response.  Accordingly, it is appropriate to consider the merits of the government's argument on the basis of the record made at hearing.[11]

### 2.  Entitlement to Evidentiary Hearing

In its Opposition, the government argued that inasmuch as the defendant had not proffered an affidavit based on personal knowledge or any other proof establishing that there was a factual dispute necessitating an evidentiary hearing, his request for such a hearing should be denied.  *See id*. at 8-9.  While it is true, as the government observes, that a criminal defendant moving to suppress evidence is not automatically entitled to an evidentiary hearing, *see id*. at 9-10; *United States v. Lewis*, 40 F.3d 1325, 1332 (1st Cir. 1994), in this district a defendant need not submit an affidavit based on personal knowledge (or comparable proof) to obtain one.

Federal Rule of Criminal Procedure 47 provides, in relevant part: "A motion may be supported by affidavit."  Fed. R. Crim. P. 47(b).  As use of the word "may" suggests, this provision is "permissive only."  Charles Alan Wright, Nancy J. King & Susan R. Klein, 3B *Federal Practice and Procedure* § 802, at 315 (3d ed. 2004).  "The court has inherent power to require that supporting affidavits be filed, but in the absence of a court order, or a local rule requiring affidavits, it is not

---

[11] Although, for the reasons stated above, there is no need to reach the defendant's arguments regarding the merits of application of the concealed-weapons statute (25 M.R.S.A. § 2001) in this case, I note that I have reviewed them and found them wanting.  In addition, the defendant raises three arguments in his reply brief that were not previously proffered in his motion: that (i) the knife found on his person did not qualify as a "throwing knife," (ii) he was placed under arrest prior to discovery of the knife, and (iii) although he had no privacy interest in the common area at 54 Knox, the gun still may be suppressed as fruit of the poisonous tree.  *See* Strike Reply at [4]-[6].  At least one of those arguments – the second – goes beyond the permissible confines of "replying to new matter raised in the *(continued on next page)*

required that affidavits be submitted." *Id*. (footnotes omitted).

The government argues that this district's Local Rule 147 does require such affidavits; however, it misapprehends the import of the rule. *See* Opposition at 9.  The rule provides, in relevant part: "Every motion shall incorporate a memorandum of law, including citations and supporting authorities.  Affidavits and other documents setting forth or evidencing facts on which the motion is based shall be filed with the motion."  Loc. R. 147(a).  Like its similarly worded civil counterpart, Local Rule 7(a), the rule does not require that affidavits be filed with every motion, but rather directs that if they are filed, they must be filed with the motion.  *Compare id. with* Loc. R. 7(a).

Nor has the First Circuit held otherwise.  As it has observed: "[T]he district court is entrusted with deciding whether to hold an evidentiary hearing [in connection with a motion to suppress] and we will not overrule the refusal to convene an evidentiary hearing unless the district court is shown to have abused its discretion."  *Lewis*, 40 F.3d at 1332.  An evidentiary hearing is "required" (and a district court hence would abuse its discretion in denying one) only if a defendant "allege[s] facts that, if proven, would entitle him to relief."  *Id*.  "To make this showing the defendant must allege facts, sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented."  *Id*. (citation and internal quotation marks omitted).  Tellingly, the basic test enunciated by the First Circuit is that a defendant must "allege" such facts, not that the defendant must proffer them via an affidavit made on personal knowledge.  While the First Circuit in *Lewis* did note that neither defendant had personally sworn out an affidavit in support of their motion to suppress, it upheld the district court's denial of an evidentiary hearing on the basis that the defendants had not alleged (in any format) sufficiently definite, specific, detailed, and nonconjectural

---

objection or opposing memorandum."  Loc. R. 147(c).  *Compare* Strike Opposition at 7-8 *with* Strike Reply at [4]-[6].

facts that, if proven, would entitle them to relief.  *See id*.   Rather, all they offered (in contrast to the government's proffer of sworn, detailed affidavits by two officers) was an affidavit of defense counsel containing "only conclusory allegations that the police lacked probable cause or a reasonable articulable suspicion of criminal activity when they arrested [the defendants]."  *Id*.

In this case, the defendant offered more.  He recited in his brief (that is, alleged) detailed, specific facts that, if ultimately proven, would entitle him to relief.  *See* Motion To Suppress at 1-5.  In short, he made a sufficient threshold showing to enable the court to conclude that a substantial claim was presented.  Accordingly, the requested evidentiary hearing was held.

### 3.  Standing To Seek Suppression of Gun

The government makes a considerably more persuasive case with respect to its second threshold argument: that the defendant lacks standing to seek suppression of the gun retrieved by Levesque from 54 Knox.  *See* Opposition at 10-13.  The defendant shoulders the burden of establishing standing for Fourth Amendment purposes.  *See, e.g., United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004) ("The Fourth Amendment does not protect privacy in any and all circumstances.  Among other limitations, a criminal defendant who wishes to embark upon a Fourth Amendment challenge must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized.  Although the usage is imprecise, courts frequently refer to this threshold requirement as implicating 'standing.'  For simplicity's sake, we shall adopt that nomenclature here.") (citations and internal quotation marks omitted).

The defendant adduced no evidence at hearing establishing that he harbored a reasonable expectation of privacy either in the locale in which the gun was found or in the gun itself.  From all that appears, he never set foot in the apartment building at 54 Knox before he sought refuge there while fleeing police on the morning of July 15, 2003.  In any event, even had he demonstrated that he resided

16

there, the location of the gun in a ceiling tile of a common hallway would have counseled against a finding of standing with respect to any items seized therefrom. *See, e.g., United States v. Paradis*, 351 F.3d 21, 31 (1st Cir. 2003) ("Paradis had no protectible privacy interest under the Fourth Amendment in the bag of .22 caliber ammunition left on the back porch of the building because he had no expectation of privacy in the common areas of a multi-family building.") (footnote omitted); *United States v. Garner*, 338 F.3d 78, 80 (1st Cir. 2003) ("[A] tenant lacks a reasonable expectation of privacy in the common areas of an apartment building[.]") (citation and internal quotation marks omitted).

Nor did the defendant establish that he harbored any reasonable expectation of privacy in the gun. At hearing, he denied that he had possessed it. Even assuming *arguendo* the truth of his December 22, 2003 written confession that he hid it in the ceiling tile at 54 Knox on the morning of July 15, 2003 (and accordingly possessed it), he still would lack standing to contest its seizure inasmuch as he abandoned it. *See, e.g., Paradis*, 351 F.3d at 31 ("[N]o person can have a reasonable expectation of privacy in an item that he has abandoned[.]") (citation and internal quotation marks omitted).

The defendant therefore lacks standing to seek suppression of the gun or any fruits of its allegedly unconstitutional seizure. *See, e.g., id.* at 32 ("[A] defendant can prevail on a 'fruit of the poisonous tree' claim only if he has standing regarding the violation which constitutes the poisonous tree[.]") (citation and internal punctuation marks omitted). In any event, even assuming *arguendo* that the defendant had established the requisite standing, I would recommend that the Motion To Suppress as it concerns the firearm be denied for the reasons discussed below.

## B. Merits of Motion To Suppress

I proceed to the merits of the Motion To Suppress. The defendant seeks suppression on

several bases of (i) the firearm, (ii) evidence of illegal drugs and (iii) all statements made. *See* Defendant's Reply to the Government's Memorandum of Law in Opposition to Defendant's Pretrial Motion (Docket No. 35) at 3. He argues that:

1.      LPD officers violated his Fourth Amendment rights inasmuch as they lacked either reasonable and articulable suspicion to detain him pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), or probable cause to effectuate his warrantless arrest. *See* Motion To Suppress at 5-8. Accordingly, he asserts, all evidence seized and statements made must be suppressed as "fruit of the poisonous tree" pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963). *See id*. at 7-8.

2.      Police on July 15, 2003 obtained statements regarding his identity in the absence of the requisite *Miranda* warning. *See id*. at 8. As a result, he seeks not only suppression of the July 15, 2003 statements but also suppression of the firearm as fruit of the poisonous tree and both December 2003 statements as tainted by the earlier *Miranda* transgression. *See id*. In any event, he asserts, police elicited his December 22, 2003 confession in the absence of any *Miranda* warning, as a result of which it should be suppressed. *See id*. at 9.

3.      Police obtained his December 19 and December 22, 2003 statements in violation of his Sixth Amendment right to counsel, which attached when he was prosecuted on state charges. *See id*. at 9-10. Alternatively, state and federal authorities colluded to end-run that Sixth Amendment right. *See id*. at 10-11. On either basis, he posits, his December 2003 statements should be suppressed. *See id*. at 9-11.

4.      Police elicited his confession by means of threats and/or promises, in violation of his Fifth Amendment protection against self-incrimination and his Fourteenth Amendment due-process rights. *See id*. at 11. As a result, he contends, the confession should be suppressed. *See id*.

With respect to all points the defendant raises except collusion in violation of his Sixth

18

Amendment rights, the government bears the burden of demonstrating the lawfulness of the challenged conduct.  *See, e.g., United States v. Leon-Delfis,* 203 F.3d 103, 110 (1st Cir. 2000) (intentional relinquishment of right to counsel); *United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992) (warrantless search or seizure); *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992) (*Miranda* compliance); *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990) (voluntariness of confession).  With respect to a claim of collusion between sovereigns, the First Circuit has adopted a shifting burden of proof:

> [T]he defendant must produce some evidence tending to prove that . . . one sovereign was a pawn of the other, with the result that the notion of two supposedly independent prosecutions is merely a sham.  If the defendant proffers evidence sufficient to support such a finding – in effect, a prima facie case – the government must shoulder the burden of proving that one sovereign did not orchestrate both prosecutions, or, put another way, that one sovereign was not a tool of the other.

*United States v. Guzman*, 85 F.3d 823, 827 (1st Cir. 1996).

For the reasons that follow, I find that the government carries its burden of proof with respect to all matters as to which it bears that burden, and the defendant fails to establish a *prima facie* case of collusion.

### 1. *Terry* Stop; Arrest

In elucidating the bounds of permissible *Terry* stops, the First Circuit has observed:

> The law governing investigative stops is well understood.  A law enforcement officer ordinarily may not stop someone and restrain his freedom to walk away unless the officer has a reasonable and articulable suspicion of criminal activity.  The reasonable suspicion test has been described as an intermediate standard requiring more than unfounded speculation but less than probable cause.  At a minimum, the officer must have a particularized and objective basis for suspicion.  When determining the legitimacy of an investigative stop, a court must undertake a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior.

An investigative stop also must be reasonably related in scope to the circumstances

which justified the interference in the first place.   If a law enforcement officer reasonably suspects criminal activity, he may briefly question the suspect about his concerns.  If he has a reasonable basis to suspect that the subject of his inquiry may be armed, he also may frisk the suspect and undertake a limited search of the passenger compartment of any vehicle in which he is sitting.   Once again, context is vital in determining the permissible scope of an investigative stop.

*United States v. Cook*, 277 F.3d 82, 85 (1st Cir. 2002) (citations and internal quotation marks omitted).  In this case, the government handily carries its burden of demonstrating that Mailhot's initial stop of the defendant and Levesque's and Gagne's subsequent pursuit, handcuffing and patdown of him passed muster pursuant to these principles.

Mailhot spied the blue Subaru Legacy with Massachusetts plates at approximately 5:30 in the morning in the wake of a report that two black males, one of whom was "B.J.," were attempting to break down the front door of an apartment house in a high-crime, high-drug-trafficking area of Lewiston.  "B.J." was believed to be B.J. Almeida, a person who had previous law-enforcement encounters in Lewiston, was considered dangerous and was the subject of an outstanding warrant for carrying a concealed weapon.  Only one suspect was found on the porch of 287 Bates, and he would not initially cooperate in revealing his identity other than to state that he was from Massachusetts.  B.J. Almeida was nowhere to be seen.  Mailhot reasonably set out in search of B.J. Almeida or a car with Massachusetts license plates, which might provide a clue to the identity of the suspect on the porch and/or aid officers in comprehending what was transpiring.

Within three hundred feet of the site of the reported disturbance, Mailhot spotted the car in which the defendant and a female companion were sitting.  Not only did the car have Massachusetts license plates, but it also was parked near the rear steps of the building rather than in a parking slip. In the circumstances, Mailhot's suspicions understandably were raised.  He reasonably decided to approach and question the occupants.  At approximately that time, either because he had not yet

20

switched on his portable radio or because his attention was focused on the individuals he had spotted in these rather tense circumstances, Mailhot, who was not himself familiar with B.J. Almeida, did not hear radio traffic indicating that B.J. Almeida had been apprehended.

At hearing, counsel for the defendant posited that, pursuant to the so-called "fellow officer" or "collective knowledge" rule, knowledge of B.J. Almeida's appearance and the fact of his apprehension should be imputed to Mailhot.  It is unlikely that the First Circuit would recognize what amounts to a "reverse" fellow-officer-rule argument intended to establish the absence, rather than the presence, of reasonable suspicion and/or probable cause. *See, e.g., United States v. Meade*, 110 F.3d 190, 194 (1st Cir. 1997) ("The fellow officer rule underlies the well-worn maxim that the collective knowledge and information of all the officers involved establishes probable cause for the arrest.  The 'collective knowledge' or 'pooled knowledge' principle has been used to validate arrests in two ways: (1) by tracing the arresting officer's action back to an *individual* in a law enforcement agency who possessed information sufficient to establish probable cause, and (2) by finding that the directing *agency* as a whole possessed the necessary facts.") (citations and internal quotation marks omitted) (emphasis in original).

In any event, even assuming *arguendo* that such an argument is cognizable and that Mailhot knew as he exited his cruiser that B.J. Almeida no longer was at large, questioning of the occupants of the Legacy remained reasonable in the circumstances.  Mailhot could not have been certain that the two suspects who were the subject of the earlier distress call acted alone.  The identity of the man on the porch then remained unknown.  The car with the Massachusetts plates and two occupants was parked suspiciously near the scene of the disturbance in an odd manner (against the back of a building rather than in a parking slip) at 5:30 in the morning in a high-crime, high-drug-trafficking neighborhood.  Once the defendant exited the Legacy wearing a heavy, insulated jacket inappropriate

21

for the season and began walking away from Mailhot (and possibly toward other officers investigating the earlier call), Mailhot's suspicions reasonably were heightened.   Mailhot knew, from his twenty-four years' experience as a police officer, that seasonally inappropriate clothing such as the defendant's leather jacket could be used to conceal weapons.   At that hour of the morning, at that high-crime location and near the scene of the earlier distress call, Mailhot's fear for his and his fellow officers' safety was sufficient to justify a brief detention and patdown of the defendant's person.   *See, e.g., Florida v. J.L.*, 529 U.S. 266, 272 (2000) (given serious threat firearms and armed criminals pose to public safety, "*Terry*'s rule . . . permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause"); *Romain*, 393 F.3d at 71 ("[I]n determining whether a pat-down search is an appropriate step following a valid *Terry* stop, the key is whether, under the circumstances, the officer is justified in believing that the person is armed and dangerous to the officer or others.") (citation and internal quotation marks omitted).

Before Mailhot could succeed in patting the defendant down he fled, peeling out of his leather jacket and running out of sight.   This development reasonably heightened Mailhot's safety fears.   *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").   What is more, the defendant fled into an apartment building presumably occupied by sleeping residents, compounding safety concerns. When Levesque and Gagne finally caught up to him, they approached him with guns drawn and immediately handcuffed him.   However, in the unfolding drama of the circumstances, even restraints of that magnitude did not  exceed the bounds of the reasonable or convert the *Terry* stop into a full-blown arrest.   Mailhot, Levesque and Gagne all harbored a reasonable suspicion that the defendant might be armed and dangerous.   *See, e.g., United*

22

*States v. Maguire,* 359 F.3d 71, 78 (1st Cir. 2004) ("Dorrance's use of his weapon when he encountered Maguire was permissible during an investigatory stop. It is well established that the use or display of a weapon does not alone turn an investigatory stop into a de facto arrest."); *United States v. Navarrete-Barron,* 192 F.3d 786, 791 (8th Cir. 1999) (in light of dangerous nature of suspected crime of drug trafficking and good possibility driver or passenger had weapon, limits of *Terry* stop were not exceeded when suspect was handcuffed while officers searched truck; "Several other circuits also have found that using handcuffs can be a reasonable precaution during a *Terry* stop."); *Gallegos v. City of Colorado Springs,* 114 F.3d 1024, 1030 (10th Cir. 1997) ("[A] *Terry* stop does not automatically elevate into an arrest where police officers use handcuffs on a suspect or place him on the ground. Police officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of a *Terry* stop.") (citations and internal punctuation omitted); *United States v. Le,* 377 F. Supp.2d 245, 254 (D. Me. 2005) ("Of course, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures without transforming a *Terry* stop into an arrest. This includes drawing weapons when reasonable, such as when officers are faced with a report of an armed threat. The First Circuit has also allowed the reasonable use of handcuffs and backup officers as the situation requires.") (citations and internal quotation marks omitted).

After Gagne patted the defendant down he seized from his right front pocket a sheathed four-inch-long knife – a so-called throwing knife – and placed him under arrest for trafficking in dangerous knives. The defendant argues that officers lacked probable cause to effectuate his arrest inasmuch as the throwing knife did not qualify as a dangerous knife pursuant to the applicable statute, 17-A M.R.S.A. § 1055. *See* Motion To Suppress at 7. The government rejoins that (i) officers did possess probable cause to arrest the defendant pursuant to section 1055, (ii) alternatively, they had probable

23

cause to arrest him for a different offense, possession of a concealed weapon in violation of 25 M.R.S.A. § 2001, and (iii) even assuming *arguendo* his arrest was without probable cause, the evidence in issue inevitably would have been discovered apart from that illegality.  I conclude that while police did not possess probable cause to arrest the defendant for trafficking in dangerous knives, they did have probable cause to arrest him for carrying a concealed weapon.  I do not reach the government's alternative inevitable-discovery argument.

Probable cause exists "when the facts and circumstances within [the police officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Suboh v. District Attorney's Office of Suffolk Dist.*, 298 F.3d 81, 96 (1st Cir. 2002).  An officer's determination that a crime has been committed need not be "ironclad" or even "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause.  *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999); *see also, e.g., Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 255 (1st Cir. 1996) ("[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").

While the "threshold for probable cause in a criminal case is low[,]" *Suboh*, 298 F.3d at 96, I conclude, upon careful review of the testimony adduced at hearing and examination of the knife that Gagne seized from the defendant's right front pocket, *see* Gov't Exh. 19, that LPD officers did not have probable cause to arrest the defendant for the crime of trafficking in dangerous knives.  The statute in issue, 17-A M.R.S.A. § 1055, provides, in relevant part:

> A person is guilty of trafficking in dangerous knives, if providing he has no right to do so, he . . . knowingly possesses . . . any knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle

of the knife, or any knife having a blade which opens or falls or is ejected into position by the force of gravity, or by an outward, downward or centrifugal thrust or movement.

17-A M.R.S.A. § 1055(1).  As the Law Court has noted, section 1055 targets, *inter alia*, butterfly knives, the use of which it has described as follows: "[T]he wielder releases one of the halves of the handle and through a combination of gravity and centrifugal force, the latter generated by a movement of the arm or wrist, the wielder swings that half of the handle around until it meets the other half. These forces also swing the *blade* into position." *State v. Michael M*., 772 A.2d 1179, 1180-81 n.1 (Me. 2001) (citation and internal punctuation omitted) (emphasis in original).

The knife in question plainly does not meet the any of the requisites of section 1055.  It has no opening mechanism whatsoever; it is nothing more than a solid piece of metal housed in a black cloth sheath.  The facts and circumstances within LPD officers' knowledge therefore were insufficient to warrant a prudent person in believing that the defendant had committed that particular offense.

Nonetheless, I agree with the government that, at the moment of the arrest, LPD officers did possess probable cause to believe that the defendant was committing the crime of carrying a concealed dangerous weapon.  The statute in question, 25 M.R.S.A. § 2001, as in effect on July 15, 2003, provided:

> No person may display in a threatening manner, or wear under his clothes or conceal about his person, any firearm, slung shot, knuckles, bowie knife, dirk, stiletto or other dangerous or deadly weapons usually employed in the attack on or defense of a person, unless excepted by a provision of law.

25 M.R.S.A. § 2001 (2003).[12]  It listed five exceptions pertaining to: (i) permits to carry concealed firearms, (ii) disabling chemicals, (iii) hunting knives, (iv) law-enforcement and corrections officers and (v) private investigators.  *See id*.

---

[12] Section 2001 was repealed effective July 1, 2004 and superseded on that date by 25 M.R.S.A. § 2001-A.  *See* Historical and *(continued on next page)*

The knife that Gagne seized from the defendant is a four-inch-long throwing knife bearing the logo "Special Forces," accompanied by an etching of a human skull wearing a beret. *See* Gov't Exh. 19. No one reasonably could mistake it for an ordinary kitchen or pocket knife. It fairly can be said to resemble a weapon.

A reasonable officer standing in Gagne's and Levesque's shoes on the morning of July 15, 2003 (i) would have known that the knife had been concealed on the defendant's person, (ii) reasonably could have believed based on the knife's appearance that it was a "dangerous or deadly weapon[] usually employed in the attack on or defense of a person[,]" and (iii) would not have been aware of any fact or circumstance tending to qualify the defendant for any of the five enumerated exceptions to the concealed-weapons prohibition. LPD officers thus had probable cause to arrest the defendant for carrying a concealed weapon in violation of 25 M.R.S.A. § 2001. For purposes of Fourth Amendment analysis, the fact that Gagne and Levesque did not actually arrest the defendant for that crime is immaterial. *See, e.g., United States v. Jones*, 2005 WL 3454678, No. 04-1606, slip op. at 12-13 (1st Cir. Dec. 19, 2005) ("As the Supreme Court has recently reiterated, . . . the probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest. Thus it is irrelevant that the booking officer cited Jones for 'intent to rob while armed.' If, on the facts known to the arresting officers, there was probable cause to believe he was committing another crime, the arrest was valid.") (citation omitted).

To summarize, I conclude that (i) officers had reasonable and articulable suspicion to conduct a *Terry*-type investigation of the defendant, and (ii) at the time of his arrest, they possessed probable

---

Statutory Notes to 25 M.R.S.A. § 2001; *see also* 25 M.R.S.A. § 2001-A.

cause to arrest him, albeit not on the charge for which he actually was then arrested.  Their conduct on July 15, 2003 thus did not violate the defendant's Fourth Amendment rights.

## 2.  Statements: Asserted *Miranda* Violations

The defendant identifies two discrete *Miranda* violations, arguing as an initial matter that his July 15, 2003 statements regarding his identity and criminal history were elicited in the absence of a required *Miranda* warning.  *See* Motion To Suppress at 8.  In response, the government invokes the so-called "routine booking" exception to the *Miranda* rule, *see* Opposition at 14, which "exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services[,]"  *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation and internal quotation marks omitted).

Inasmuch as appears, officers queried the defendant as to his identity and his criminal history as part of their quest to confirm that he was indeed Evans Etrons Stroman.  Nonetheless, that is not the end of the analysis: Although the routine-booking exception is "phrased in terms of the officer's intention, the inquiry into whether [it] is thus inapplicable is actually an objective one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response."  *United States v. Reyes*, 225 F.3d 71, 76-77 (1st Cir. 2000).  As the First Circuit has further elucidated:

> [W]e think that it would be a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate *Miranda*.  We can imagine situations, of course, that would present a closer case than this one.  For example, asking a person's name might reasonably be expected to elicit an incriminating response if the individual were under arrest for impersonating a law enforcement officer or for some comparable offense focused on identity; likewise, asking an individual's date of birth might be expected to elicit an incriminating response if the individual were in custody on charges of underage drinking; and questions about an individual's Social Security number might be likely to elicit an incriminating response where the person is charged with Social Security fraud.  In such scenarios, the

> requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned.  In contrast, the appellant here was being booked on charges of participating in a criminal drug conspiracy, to which his name, date of birth, and Social Security number bore no direct relevance.

*Id*. at 77.  At hearing, counsel for the defendant posited that questions regarding the defendant's criminal history were reasonably likely to elicit an incriminating response because they bore on whether he was a felon in possession of a firearm.  Nonetheless, the defendant was questioned prior to discovery of the firearm at 54 Knox.  Police could not reasonably have been expected to foresee that they might be laying the predicate for a charge related to firearm possession.  The government carries its burden of demonstrating that the circumstances surrounding the July 15, 2003 statements meet the routine-booking exception.

The defendant next asserts that his December 22, 2003 statements were elicited in violation of *Miranda* because obtained without benefit of a *Miranda* warning.  *See* Motion To Suppress at 9.  Nonetheless, Campbell had given the defendant a *Miranda* warning just three days earlier, on December 19, 2003, and reminded him at the start of the December 22 interview that his *Miranda* rights still were operative.   In circumstances such as these, courts have discerned no *Miranda* violation.  *See, e.g., United States v. Clay*, 408 F.3d 214, 221-22 (5th Cir. 2005) ("Clay argues that Officer Rabb's failure to advise him of his *Miranda* rights before he filled out the Bill of Particulars renders the form inadmissible.  Clay fails to explain, however, why the *Miranda* warning officers gave him two days earlier, at the time of his arrest, was no longer effective.  While the passage of time between a defendant's receipt of his *Miranda* rights and his confession may be a factor in determining the voluntariness of the confession, the passage of time is not itself necessarily sufficient to render *Miranda* warnings ineffective."); *United States. v. Rodriguez-Preciado*, 399 F.3d 1118, 1128-29 (9th Cir.), *modified on other grounds*, 416 F.3d 939 (9th Cir. 2005) (officers were not required to

28

readminister *Miranda* warnings to suspect on second day of interrogation, in circumstances in which "there were no intervening events which might have given Rodriguez-Preciado the impression that his rights had changed in a material way"); *Brewer v. Yearwood*, 30 Fed. Appx. 713, 714 (9th Cir. 2002) ("[W]e reject Brewer's argument that the authorities were obliged to provide fresh *Miranda* warnings before the second interview or before the initiation of questioning by the second interviewer. The circumstances of Brewer's detention had not changed so seriously that his answers no longer were voluntary, knowing, and intelligent. He could still recall the *Miranda* warnings given the day before, and there is no evidence of coercion.") (citations omitted).

The government accordingly meets its burden of demonstrating that requisite *Miranda* warnings were given or an exception to the need for such warnings pertained.

### 3. Asserted Sixth-Amendment Violations

The defendant next asserts that Campbell and Clifford interviewed him in December 2003 in violation of the Sixth Amendment right to counsel that attached in connection with his state prosecution. *See* Motion To Suppress at 9-10. Alternatively, he suggests, that right was violated when state and federal authorities colluded to end-run its protections. *See id.* at 10-11.

During the pendency of the instant motion, the First Circuit handed down a case definitively resolving the first of the defendant's points. In *United States v. Coker*, 2005 WL 3536544, No. 04-2154 (1st Cir. Dec. 28, 2005), the First Circuit held that, in accordance with the so-called "dual sovereignty doctrine," a right to counsel that attaches in connection with a state prosecution does not attach to an identical, uncharged federal offense. *See Coker*, No. 04-2154, slip op. at 6-7, 18. Thus, federal agents did not run afoul of any Sixth Amendment right arising from the defendant's state prosecution when questioning him with respect to the uncharged federal offense.

In any event, as the government points out, even assuming *arguendo* that the defendant did not

face the dual-sovereignty bar, his premise would miss the mark for at least two reasons: (i) the knife-possession and drug-distribution offenses for which he was prosecuted by the state are separate and distinct from the firearms-possession charge that federal authorities were investigating, and, (ii) in any event, his Sixth Amendment right to counsel had terminated prior to his questioning by Campbell in December 2003.  *See* Opposition at 17-18.

> The First Circuit has observed:
>
> The right to counsel attaches only upon the initiation of adversary judicial criminal proceedings against the defendant, and thereafter the right applies to all critical stages of the prosecution, before, during and after trial.   After the right to counsel has attached, the government and its agents are constitutionally prohibited from deliberately seeking information from an accused in the absence of defense counsel. The right to counsel is offense specific, however, so an accused charged with one crime cannot invoke a  right to  counsel with respect to other uncharged crimes.

*United States v. Bartelho*, 129 F.3d 663, 674-75 (1st Cir. 1997) (citations and internal quotation marks omitted); *see also, e.g., Coker*, No. 04-2154, slip op. at 6 (The "right to counsel does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.") (citation and internal quotation marks omitted).

There is no evidence that the State ever initiated "adversary judicial criminal proceedings" against the defendant with respect to the charge of possession of firearm by a felon.  Hence, even assuming *arguendo* – contrary to the First Circuit's holding in *Coker* – that the right to counsel arising upon prosecution of a state crime applied to the investigation of a parallel, uncharged federal crime, no such right arose in this case.  *See, e.g., United States v. Nocella*, 849 F.2d 33, 37 (1st Cir. 1988) ("[W]e conclude rather easily that, even after the state marijuana charge was proffered, it was entirely proper for the task force to continue its investigation of defendant's suspected criminal involvement in other offenses, such as dealing harder drugs.").

In any event, as the government points out, *see* Opposition at 17-18, the defendant's Sixth Amendment right to counsel arising from the state prosecution terminated before Campbell interviewed him in December 2003.  On November 5, 2003 the defendant pleaded guilty to one state charge, and the remaining state charges against him were dismissed.  His Sixth Amendment right to counsel with respect to those charges ended at that time.  *See, e.g., United States ex rel. Espinoza v. Fairman*, 813 F.2d 117, 124-25 (7th Cir. 1987), *abrogated on other grounds as recognized in United States v. LaGrone*, 43 F.3d 332 (7th Cir. 1994) ("The Sixth Amendment right vests when an individual becomes the accused.  From that point on the accused is entitled to have an attorney present at all critical stages of the prosecution.  This right continues for as long as the individual remains the accused.  That is, until the individual is either convicted or freed by reason of acquittal or dismissal of the charges.") (citations and internal punctuation omitted).

As the defendant suggests, *see* Motion To Suppress at 10, "collusion by the prosecutorial authorities to circumvent the right to counsel may cause Sixth Amendment protection to bridge the gap between separate and non-intertwined offenses[,]" *United States v. Martinez*, 972 F.2d 1100, 1105 (9th Cir. 1992).  However, the collusion exception pertains only if a defendant "proffer[s] evidence sufficient to establish a prima facie case that the two prosecutions were for the same offense." *Coker*, No. 04-2154, slip op. at 15 (citation and internal quotation marks omitted).  "In other words, [a defendant] must produce some evidence tending to prove that one sovereign was a pawn of the other, with the result that the notion of two supposedly independent prosecutions is merely a sham."  *Id.* (citation and internal punctuation omitted); *see also, e.g., Guzman,* 85 F.3d at 827 (recognizing a "narrow" exception to rule that double jeopardy does not bar parallel state, federal prosecutions when "one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings").

31

The defendant falls short of making out even a *prima facie* case of collusion.  No evidence was adduced at hearing from which one could conclude, either directly or by reasonable inference, that State or federal authorities dominated or manipulated each other in this case.  From all that appears, the State decided it lacked sufficient evidence to press a felon-in-possession charge against the defendant.  It made a garden-variety referral to federal authorities for investigation of possible federal firearms-related charges.  It then proceeded, on its own timetable, to prosecute the defendant on other charges.  For their part, federal investigators conducted an independent investigation on their own timetable.  One might speculate, based on the fact that Campbell initiated his investigation in July 2003 but did not question the defendant until December 2003 (when his Sixth Amendment right to counsel had lapsed) that Campbell schemed to avoid involvement of the defendant's counsel, George Hess.  However, Campbell explained that (i) he did not want to interview the defendant until after he received the results of the MSP's fingerprint analysis, and (ii) he did not receive those results until early December 2003.  This is an uncontroverted, and perfectly reasonable, explanation for the timing of the interview.

In sum, the government carries its burden of demonstrating that the defendant's Sixth Amendment right to counsel was not violated, and the defendant fails to make out a *prima facie* case of collusion in violation of that right.

### 4.  Challenge to Voluntariness of Confession

I turn to the defendant's final assertion: that his confession was extracted involuntarily, as a result of promises and/or threats, in violation of the Fifth Amendment's protection against self-incrimination and the due-process clause of the Fourteenth Amendment.  *See* Motion To Suppress at 11.  The government rejoins that the defendant's confession was voluntary and that he voluntarily and knowingly waived his *Miranda* rights.  *See* Opposition at 14-18.  I agree.

32

As the First Circuit has noted, "The requirement that a confession must be voluntary in order to be admitted into evidence rests on two constitutional bases: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment." *United States v. Faulkingham*, 295 F.3d 85, 90 (1st Cir. 2002) (citation and internal quotation marks omitted). To the extent the defendant makes a Fifth Amendment argument, he argues, in essence, that statements were elicited in non-compliance with *Miranda*. *See, e.g., id.* ("Faulkingham's statements were obtained in violation of the Fifth Amendment because he was not given a *Miranda* warning."); *Dickerson v. United States,* 530 U.S. 428, 435 (2000) ("[In *Miranda,* we] concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself.") (citation and internal quotation marks omitted). To the extent he presses a Fourteenth Amendment voluntariness argument, the government bears the burden of showing, based on the totality of the circumstances, that investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940).

As the First Circuit recently has summarized the confluence of these concepts:

Determining the validity of a *Miranda* waiver usually entails two separate inquiries. The waiver must be both voluntary, and knowing and intelligent. A waiver is voluntary when it is the product of a free and deliberate choice rather than intimidation, coercion, or deception. A waiver is knowing and intelligent when made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Both inquiries are judged based on the totality of the circumstances surrounding the interrogation. Assuming there has been no *Miranda* violation, then the standard shifts: Only confessions procured by *coercive official tactics* should be excluded as involuntary.

*United States v. Bezanson-Perkins*, 390 F.3d 34, 39-40 (1st Cir. 2004) (citations and internal punctuation omitted) (emphasis in original).

I first consider the voluntariness of the defendant's *Miranda* waiver. From all that appears,

33

the defendant had no substantive communication at all with Campbell and Clifford prior to being read his *Miranda* rights and agreeing to waive them. He chose to talk to the agents; he was not intimidated, coerced or tricked into doing so. At hearing he testified, in effect, that his waiver was not knowing and intelligent – that is, that he did not understand his rights. As noted above, I do not find this testimony credible. The defendant told Campbell at the time that he did understand each right as it was read to him. From all that appears, this was true. Although he was young (then 20 years old), he was no stranger to the criminal-justice system. Twice prior to his July 2003 arrest he had been jailed for crimes. On both of those prior occasions, he had been read his *Miranda* rights and had been represented by counsel. He had also been represented by counsel in connection with the state charges stemming from his July 2003 arrest. At no time during those proceedings had he made any confession concerning possession of the gun retrieved at 54 Knox. Finally, the defendant had an eighth-grade education and could read and write. There is no evidence that his mental faculties were impaired or that he was otherwise, for any reason, incapable of understanding his rights. Nor is there any evidence that the defendant's circumstances changed between December 19, 2003, when he first was advised of and waived his *Miranda* rights, and December 22, 2003, when he contacted agents to state that he wanted to come clean. I find that the government has carried its burden of proving that on December 19, 2003 the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights for purposes of both the December 19 and December 22, 2003 interviews with agents.

The question remains whether, despite, a voluntary, knowing and intelligent waiver of *Miranda* rights, the defendant's confession nonetheless was extracted by coercive official tactics. *See, e.g., Bezanson-Perkins*, 390 F.3d at 40 ("There are surely situations in which statements made after a valid *Miranda* waiver are subject to suppression, for a number of reasons. For example, police may not get a *Miranda* waiver and then beat a confession out of a suspect and hope to have the

34

confession admitted into evidence.  Such a confession would be procured by coercive tactics.  Nor may police, against the suspect's wishes, induce intoxication or a drugged state such that any further statement by the suspect is coerced.") (citations omitted); *Rice v. Cooper*, 148 F.3d 747, 750 (7th Cir. 1998) (in context of voluntariness of confession, "[t]he relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers.") (citation omitted).

I am satisfied that in this case the evidence as a whole indicates that the defendant's will was not overborne by coercive police activity.  As discussed above, I do not find credible the defendant's testimony that Campbell promised him he would be released on his scheduled release date if he confessed and alternatively threatened that he would not be released on that date if he did not confess.  At hearing, defense counsel suggested that the fact that his client was freed on his scheduled release date – after confessing – tended to corroborate that such a threat and promise had been made.  This is highly improbable.  The defendant's release date was December 29, 2003.  The government introduced evidence that, after the December 22, 2003 interview, Campbell requested a Nexus Report for purposes of demonstrating that the firearm in question had traveled in interstate commerce.  That report was not completed until February 5, 2004.  Campbell then forwarded the case to the United States Attorney's Office for a decision whether to prosecute.  There is no reason to believe the government would have been in a position to seek to detain the defendant any earlier than this point in time.  *See, e.g., Carchman v. Nash*, 473 U.S. 716, 719 (1985) ( "A detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent.  Detainers generally are based on outstanding criminal charges, outstanding parole- or probation-violation charges, or additional sentences already imposed against the prisoner.") (citations

35

omitted).

The government accordingly carries its burden of demonstrating that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights and that his December 22, 2003 confession was not the product of coercive official tactics.

### III. Conclusion

For the foregoing reasons, I **DENY** the Motion To Strike and recommend that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 9th day of January, 2006

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

36